UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AA, by and through her parents BB and CC, et al.,

Plaintiffs,

v.

City of New York, et al.,

Defendants.

25 Civ. 0752 (DEH)

**OPINION AND ORDER**

DALE E. HO, United States District Judge:

Plaintiffs are two minor children, AA and DD, and each child's parents. They bring a federal claim under Title IX and numerous state-law claims against the New York City Department of Education ("DOE") and the City of New York (collectively, "City Defendants"), as well as the Mosholu Montefiore Community Center ("MMCC") and Child Development Center of Mosholu Montefiore Community Center (collectively, "MMCC Defendants"). Among the relief requested by Plaintiffs are punitive damages under the New York City Human Rights Law ("NYCHRL") and the city's Gender-Motivated Violence Protection Act ("GMVPA").

Before the Court are two motions: City Defendants' Rule 56(a) Amended Motion for Partial Summary Judgment ("Mot."), ECF No. 135, which seeks summary judgment on Plaintiffs' claims of deliberate indifference under Title IX, negligent supervision, negligent hiring and retention, and respondeat superior;[1] and City Defendants' Supplemental Rule 56(a) Motion for Partial Summary Judgment, ECF No. 153, which seeks summary judgment on Plaintiffs' requests for punitive damages. MMCC Defendants oppose the former motion, and Plaintiffs oppose both.

[1] City Defendants previously filed a Motion for Partial Summary Judgment, ECF No. 128. The Court subsequently granted leave to file the amended motion, which corrects non-substantive errors in the original motion. *See* ECF. No. 136.

For the reasons discussed below, City Defendants' Amended Motion for Partial Summary Judgment on Plaintiffs' Title IX and negligence claims is **DENIED**, except as to any claim for negligent hiring (as opposed to negligent retention) of McNeal. By contrast, City Defendants' Motion for Partial Summary Judgment as to punitive damages is **GRANTED**.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements and evidentiary submissions in connection with City Defendants' motions. The facts are either undisputed or, if disputed, resolved in the light most favorable to Plaintiffs as the non-moving party, with all reasonable inferences drawn in Plaintiffs' favor. *See Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023), *aff'd and remanded*, 604 U.S. 593 (2025).

### I. The Beacon and Summer Rising Programs

This case arises out of events while minors AA and DD were attending an after-school program (Beacon@185) and a summer program (Summer Rising) at P.S. 185, a New York City public school. *See* Defs. Local R. 56.1 Statement ("Defs. Statement") ¶¶ 1-4, ECF No. 135-3; Pls. Response and Counter-Local R. 56.1 Statement ("Pls. Response") ¶¶ 9-10, ECF No. 160. As described further below, Defendant DOE, which operates New York City Public Schools, as well as the Department of Youth and Community Development ("DYCD") of Defendant City of New York, partner with community-based organizations ("CBOs") to offer after-school programs ("Beacon programs") and summer programs like Summer Rising. Defs. Statement ¶ 28; Pls. Response ¶¶ 9-10, 31, 107-10. The CBO provider of both Beacon@185 and Summer Rising was Mosholu Montefiore Community Center ("MMCC"). Pls. Response ¶¶ 9-10. AA participated in the two programs from the summer after her kindergarten year through second grade, while DD participated during second grade, the ensuing summer, and the beginning of her third grade year. Pls. Response ¶¶ 111-12.

Beacon@185 was an after-school program that began at 2:40 p.m, at which time DOE teachers would escort students from school to the program. Defs. Statement ¶¶ 34-35. DOE activities, including separate after-school programs run by DOE, continued to occur simultaneously in the same P.S. 185 building with the Beacon program, and DOE staff were regularly present at the school during Beacon hours. Defs. Statement ¶¶ 40-41; Pls. Response ¶¶ 359, 361.

Summer Rising was a summer program developed in collaboration between DOE and DYCD, and (like Beacon@185) it operated through a partnership between those two entities and MMCC. *See* Pls. Response ¶ 10, 26, 31. The program involved morning sessions led by DOE teachers (but with MMCC staff sometimes present and jointly leading instruction) and afternoon sessions led by MMCC staff—both of which students were required to attend in order to participate in Summer Rising. Defs. Statement ¶ 32; Pls. Response ¶¶ 33, 317.

## II. City Defendants' Involvement in the Programs

### A. DOE

For the Beacon program, MMCC was required to obtain a permit from DOE, approved by the school principal, which allowed it to use particular rooms at P.S. 185; the program was not allowed to use spaces not on the permit. *See* Pls. Response ¶¶ 50-51. The principal at P.S. 185 was Andrea Woodhouse Spence. Defs. Statement ¶ 5. It was her responsibility to ensure that a CBO like Beacon was using only the spaces it was permitted to use, and she could also revoke Beacon's permission to use a specific space in the school if necessary. Pls. Response ¶¶ 52-53.

Both DYCD and DOE collaborated in overseeing the program. *See Id.* ¶ 9. Specifically, it is DOE policy that after-school programs are "an extension of the academic day," so that even when principals are not running the programs they "are in lockstep with the provider," and DOE personnel "work closely" with CBO staff. *Id.* ¶¶ 285-88. Generally, DOE requires that principals

meet at least monthly with CBOs, and CBOs respond when DOE principals raise concerns about a program. *Id.* ¶¶ 289, 294. Among other things, DOE requires CBOs to report incidents at a Beacon program to DOE; DOE staff, in turn, must report incidents of actual or suspected abuse to various entities including the superintendent and, in some circumstances, the police. *Id.* ¶¶ 299-300. DOE also maintains an internal incident reporting system, the Online Occurrence Reporting System ("OORS"). *Id.* ¶ 308. When, as required, a CBO like MMCC reported a relevant incident, DOE staff were then required to enter this information into OORS. *Id.* ¶ 77.

In particular, Principal Spence and her assistant principal Meredith Flynn supervised Beacon@185. *See* Defs. Statement ¶ 6; Pls. Response ¶ 22. Principal Spence held weekly meetings with Porscha McNeill, MMCC's program director for Beacon@185, so that she could remain abreast of teacher and parent complaints, help "bridge" school and after-school, and try to improve the after-school environment. Defs. Statement ¶ 13; Pls. Response ¶ 54; *see also* Pls. Response ¶ 332, 342-43. At these and other meetings, Principal Spence raised teacher and parent complaints about Beacon and directed McNeill to take steps to address those concerns. Pls. Response ¶¶ 344-46, 348. Spence understood that it was part of her responsibility as principal to address parent concerns about the after-school program, and Assistant Principal Flynn similarly understood that she had a responsibility to act in response to incidents involving children at the school, as part of their ultimate responsibility for student safety. *Id.* ¶¶ 54-55. Principal Spence was in the school building during after-school hours four or five days a week, during which times she conducted walkthroughs of the Beacon program and alerted McNeill to any issues she observed, which McNeill would then address. *Id.* ¶¶ 350-54. Ultimately, a DOE principal like Spence could request to change the CBO Beacon provider at a school if there were sufficient concerns. *Id.* ¶ 316.

When it came to Summer Rising, DOE and MMCC operated "as one team." Pls. Response ¶ 10. Summer Rising operated under DOE authorization, and DOE coordinated day-to-day logistics, programming, and professional development for staff. *Id.* ¶ 10, 319-22. On every day but Fridays, at least one DOE employee was required to be on site during the CBO-led afternoon sessions. *Id.* ¶ 318. Additionally, every Summer Rising site has a "principal in charge" responsible for the site—in this case, Principal Spence. *Id.* ¶ 329. Either the principal in charge or the assistant principal was required to be on site for the entire day, including the CBO-led afternoon sessions. *Id.*

DOE and MMCC also had overlapping personnel. MMCC program director McNeill also worked for DOE as a substitute teacher at P.S. 185. *Id.* ¶¶ 123, 333-34. And P.S. 185's full-time parent coordinator Monika Vargas also worked as an after-school instructor for MMCC. Defs. Statement ¶¶ 15-17; Pls. Response ¶¶ 120, 122, 335. Vargas used her DOE office for Beacon instruction, despite the fact that this room was not one of the school spaces Beacon had a permit to use. Pls. Response ¶¶ 339-40.

**B. DYCD**

DYCD was also heavily involved in the Beacon and Summer Rising programs. DYCD funded the programs and established guidelines that MMCC was required to follow, such as attendance targets, required hours, and requirements concerning the types of activities offered. *Id.* ¶¶ 57-58, 60. DYCD also had to approve CBO work-scopes, which included staffing plans and "on-the-ground" schedules. *Id.* ¶¶ 65-66. And for Summer Rising, in particular, DYCD set the daily schedule. *Id.* ¶ 404. DYCD also requires CBOs like MMCC to obtain and maintain a School-Aged Child Care ("SACC") license. *Id.* ¶ 62. DYCD requires background checks and specific trainings for CBO staff, and imposes supervision rules including mandatory staff-to-student ratios. *Id.* ¶¶ 63, 67.

As a condition of funding, DYCD requires that CBOs promptly report to DYCD any incidents relating to the health, safety, or wellbeing of an individual at a DYCD-funded program, including sexual incidents and suspected child abuse. *Id.* ¶¶ 68-73; 395-99. It has an online system, DYCD Connect, on which CBOs must enter program data and report such incidents. *Id.* ¶¶ 390, 395-99. DYCD also requires CBOs to notify DOE and parents of such incidents. *Id.* ¶¶ 400-01.

DYCD can take various forms of corrective action if a CBO is not complying with DYCD requirements, and has investigative powers over a CBO provider to look into such concerns. *See id.* ¶¶ 67, 402, 465. For instance, DYCD can direct CBOs to reconfigure staffing if it learns that a staff member is improperly supervising a group of students alone, and has the authority to remove a CBO staff member from a particular site. *Id.* ¶¶ 388, 463-64. It can also impose strategic action plans ("SAPs") or corrective action plans ("CAPs"), which can affect a CBO's ability to contract with the city and thus prompt a CBO to correct problems. *Id.* ¶¶ 450-52. Ultimately, DYCD can revoke funding and terminate a CBO if needed—including for violating incident reporting policies. *Id.* ¶¶ 67, 375-76, 460.

To assist with all this oversight, DYCD employs program managers responsible for supervising individual programs. *Id.* ¶¶ 22, 74, 405. Nicole Manning was the DYCD program manager with oversight over both Beacon@185 and Summer Rising. *Id.* ¶ 29. It was her responsibility to ensure MMCC was complying with the various requirements for running a program in a DOE building, including SACC licensing and DYCD incident reporting policies. *Id.* ¶¶ 74, 407. Accordingly, Manning conducted site visits, at which she was to confirm that staff had been cleared with the required background checks, had undergone required trainings, were complying with mandated staff-to-student ratios, and were complying with incident reporting requirements. *Id.* ¶¶ 63, 67, 74, 407, 422-48. During site visits, it was the program manager's

responsibility to review staff files, observe classroom activities, review the on-site activity schedule, and review incident report records to ensure compliance with reporting requirements. *Id.* ¶ 74. Program managers also typically hold monthly check-ins with CBO program directors and more generally advise them. *Id.* ¶¶ 74, 409, 411, 420. If needed, a program manager could advise a CBO like MMCC to notify parents of certain incidents and could determine that a "coaching visit" from DYCD was needed to deal with any problems. *Id.* ¶¶ 74, 449. A program manager could also impose a CAP if needed. *Id.* ¶¶ 453-55.

## III. The Events Underlying This Lawsuit

### A. Events Before March 2023

Miles McNeal was a staff member at both the Beacon@185 and Summer Rising programs. Defs. Statement ¶ 19; Pls. Response ¶ 113. As later became apparent, he sexually abused AA, DD, and other children at these programs, including by creating child pornography of them. Pls. Response ¶¶ 114-16, 118-19. Prior to March 2023, MMCC staff witnessed McNeal singling out AA and having her sit on his lap in the classroom and cafeteria, which led MMCC program director McNeill to hold meetings telling staff not to have children on their laps. *Id.* ¶¶ 134-38, 146. MMCC and DOE staff also witnessed McNeal alone with AA and other children in the hallway, despite MMCC's "rule of three" requiring that no child be alone with any one staff member. *Id.* ¶¶ 144-45, 148. At times, McNeal took children, including AA and DD, out of class or activities, asking over his walkie-talkie for someone to cover his class. *Id.* ¶ 147.

### B. The March 20, 2023 Incident

On March 20, 2023, DOE teacher Monica Niemes was working in her classroom after the end of the school day. Defs. Statement ¶ 8; Pls. Response ¶¶ 78-79. As she was preparing to leave, she looked up and saw a female student (later identified as second-grader DD) sitting on McNeal's lap. McNeal was moving his legs up and down underneath her. Niemes saw this

continue for about a minute before McNeal noticed that Niemes was observing, at which time he moved DD off his lap and then left the room. Niemes was concerned for DD's safety and reported what she had seen to Principal Spence and Assistant Principal Flynn. *See* Pls. Response ¶¶ 79-81. Niemes informed Spence and Flynn that McNeal was alone with DD, that McNeal was moving his legs up and down underneath her while she was on his lap, and that she was concerned for the safety of the child. *Id.* ¶ 82. Assistant Principal Flynn filled out an OORS report, and also alerted MMCC program director McNeill of the incident. *Id.* ¶¶ 83, 85. McNeill testified that she did not report the incident on DYCD's online reporting system. *Id.* ¶ 96. Flynn's OORS report omitted that McNeal was moving his legs under DD, that Niemes was concerned for DD's safety, and that McNeal had isolated DD away from her classmates—all information that ordinarily should have been included in an OORS report. *Id.* ¶ 87. The report also falsely indicated that the incident was an external incident occurring off school property, and falsely stated that MMCC program director McNeill went to the classroom after the incident. *Id*. Moreover, Spence and Flynn did not report or could not recall if they had reported the incident to numerous entities or to DD's parents, contrary to established procedures. *Id.* ¶¶ 159-60. Nor did Spence or Flynn follow up with McNeill further about the incident or ask about any other issues or concerns with McNeal. *Id.* ¶ 161.

McNeill sought to fire McNeal after the March 2023 incident, but her MMCC supervisors had her only suspend him instead, and he was suspended for one day. Defs. Statement ¶¶ 91-92; Pls. Response ¶¶ 47-48. He received no other discipline, supervision, or additional training. Pls. Response ¶ 164. McNeill emailed Principal Spence and Assistant Principal Flynn, informing them that McNeal had been suspended. *Id.* ¶ 86. Neither Spence nor Flynn responded to the email, and McNeill testified that she was disappointed because if Principal Spence had supported her effort

to fire McNeal, that would have been more likely to occur. *Id.* ¶ 86. An email memorializing the suspension was placed in McNeal's employee file. *Id.* ¶ 153.

On April 17, 2023, DYCD program manager Nicole Manning conducted a site visit at Beacon@185. *Id.* ¶ 175. Manning reviewed staff files, including McNeal's file, which contained the email memorializing the lap sitting incident and suspension and also showed that McNeal's background check clearance was awaiting approval. *Id.* ¶¶ 176, 178. About a month and a half later, on June 2, 2023, McNeill emailed Manning reports about Beacon@185, including employee disciplinary write-ups. *Id.* ¶ 182. Attachments to the email stated that McNeal had been suspended for the March 20, 2023 incident and included McNeill's email suspending McNeal. *Id.* ¶¶ 183-84. Neither Manning nor anyone from DYCD followed up with McNeill about the incident or imposed any corrective action on MMCC as a result of the incident and MMCC's failure to report it on DYCD's online system as required. *Id.* ¶ 185. Manning made another site visit on July 25, 2023 where she reviewed DD's student file. *Id.* ¶¶ 187-88.

### C. Further Incidents

McNeal continued to teach at Summer Rising and Beacon@185. He made efforts to remain with AA's and DD's student group, despite being transferred to other groups. *Id.* ¶¶ 193-97. He was seen in school spaces he was not supposed to be in and was warned about this by McNeill. *Id.* ¶¶ 198, 202. In the summer of 2023, MMCC staff witnessed McNeal leering at AA in a disturbing manner in the cafeteria during the transition from the DOE-led morning session to the MMCC-led afternoon session, and reported this to McNeill, who ordinarily would report such an incident to Principal Spence. *Id.* ¶¶ 189-92.

In fall 2023, McNeal became a photography instructor. *Id.* ¶¶ 203-04. In this capacity, he would sometimes take students out of class for a video project. *Id.* ¶ 206. Some MMCC staff noticed that McNeal only took female students out of class, refused to let McNeal take students

out of their classrooms, and reported this concern to their MMCC superiors including McNeill. *Id.* ¶¶ 207-08. On one occasion, an MMCC staff member found McNeal alone with DD in an unused classroom, and on other occasions MMCC staff saw McNeal have DD sit on his lap in her classroom or take her out of class alone. *Id.* ¶¶ 212-13. McNeill spoke to McNeal and warned him about this conduct, and also repeatedly gave trainings in staff meetings that children should not be taken out of class alone and should not sit on staff members' laps. *Id.* ¶¶ 209, 214.

On October 27, 2023, Manning conducted another site visit of Beacon@185. *Id.* ¶ 215. She again reviewed DD's student file and McNeal's employee file, which still contained the email memorializing his suspension for the March 20, 2023 incident. *Id.* ¶¶ 216-17.

On November 20, 2023, McNeal again took DD out of class and brought her with him to the library, where they were alone. *Id.* ¶¶ 97, 223. When DD's mother FF came to pick her up, DD initially could not be located, but was found leaving the library; McNeal followed out of the library. *Id.* ¶¶ 224-226. That night, DD told her mother about some of McNeal's conduct, and FF emailed Principal Spence, Vargas, and McNeill. *Id.* ¶¶ 227-28. FF reported that DD was alone with McNeal that day, that McNeal had taken pictures of DD and AA including of AA's "back," that McNeal apparently had such a close relationship with AA that she "would do whatever he told her to do," and that McNeal asked DD to wear specific clothing to be photographed in. *Id.* ¶¶ 98, 228. The next day, DD's mother emailed again after learning from DD that McNeal had touched and tickled her, and had taken other children out of class, as well. *Id.* ¶¶ 229-31. Vargas and McNeill also told Principal Spence about these emails, but Principal Spence never responded to them. *Id.* ¶¶ 232-34. No one contacted AA's parents or the parents of other children mentioned by DD, and no one from DOE or MMCC called the police or made other required reports of the incident. *Id.* ¶¶ 237-38, 247. The school district's superintendent's office eventually filed a

complaint against Principal Spence for failing to contact police after FF's emails. *Id.* ¶ 101. McNeal was ultimately fired on November 22, 2023. *Id.* ¶ 102.

AA's parents only learned of these events from DD's father, and it was they who called the police. *Id.* ¶¶ 248-49. Police officers visited P.S. 185 on December 6, 2023, after which visit Principal Spence reported FF's emails up the DOE chain and MMCC created an incident report in DYCD's online system. *Id.* ¶¶ 250-53. Upon receiving that report, no one from DYCD asked to see FF's emails, imposed a CAP on MMCC for failure to timely report the incident, inquired about prior incidents with McNeal, contacted the police, or contacted any parent of any child involved. *Id.* ¶ 254. McNeal was eventually arrested and pled guilty to a course of sexual conduct against a child. *Id.* ¶¶ 105, 116.

In February 2024, DYCD suspended and then terminated MMCC's contract, partly because of the failure to report incidents at their programs. Defs. Statement ¶ 106; Pls. Response ¶ 103. DYCD also directed that MMCC remove McNeill from her position at P.S. 185. Pls. Response ¶ 275. Meanwhile, McNeill was fired from DOE for claiming to work overlapping hours for her DOE position and her position as Beacon program director. *Id.* ¶ 274.

## LEGAL STANDARD

City Defendants move for partial summary judgment under Rule 56(a).[2] Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

[2] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, the Court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236. But the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I. Title IX Deliberate Indifference Claim

"Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). As relevant here, the statute "provides a remedy to a student who is subjected to sexual harassment by a teacher or professor at an

educational institution receiving federal funds." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 88-89 (2d Cir. 2011). For a recipient of federal funds to be liable for discrimination in the form of such harassment, a plaintiff must show that "an official with authority to act on the school's behalf has actual knowledge of the discrimination in the recipient's programs and is deliberately indifferent." *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1092 (2d Cir. 2024). Further, the deliberate indifference must "cause students to undergo harassment or make them liable or vulnerable to it." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). A recipient is deliberately indifferent when its "response to sex discrimination . . . [is] clearly unreasonable in light of known circumstances." *Schiebel*, 120 F.4th at 1094-95. Finally, the Supreme Court has limited deliberate indifference liability under Title IX to "circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645.

Here, City Defendants argue that Plaintiffs have failed to establish triable issues of fact regarding the elements of actual knowledge, deliberate indifference, and substantial control. The Court concludes otherwise for the reasons that follow.

**A. Actual Knowledge**

Under Title IX, the requirement of actual knowledge can be satisfied by knowledge of "a substantial risk of serious harm." *Zamora v. N. Salem Cent. Sch. Dist.*, 414 F. Supp. 2d 418, 424 (S.D.N.Y. 2006). "Most federal courts appear to agree that the 'actual knowledge' need only be of facts indicating that the teacher has *the potential* to abuse a student." *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 397 (E.D.N.Y. 2005). Courts have found sufficient actual knowledge when "the conduct that allegedly put the administration on notice and the conduct ultimately at issue in the litigation [are] sufficiently similar." *Doe v. Norwalk Bd. of Educ.*, No. 21-cv-0290, 2023 WL 1353436, at *3 (D. Conn. Jan. 31, 2023).

1. DOE

It is undisputed that Principal Spence and Assistant Principal Flynn received actual notice of the March 20, 2023 incident on that day. *See* Pls. Response ¶¶ 81-82. Nor do City Defendants dispute that Principal Spence and Assistant Principal Flynn are generally "official[s] with authority to act on the school's behalf," with regard to alleged discrimination. *Schiebel*, 120 F.4th at 1092. City Defendants argue, however, that the March 20, 2023 incident "did not place the municipal defendants on actual notice of McNeal's exact conduct." Mem. in Supp. of Mot. at 4, ECF No. 135. But that overstates the actual knowledge requirement. The officials need not have actual knowledge of the "exact conduct" that gives rise to an eventual claim, but only "enough knowledge of the harassment that [they] reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 361 (S.D.N.Y. 2014); *see also Zamora*, 414 F. Supp. 2d at 424; *Tesoriero*, 382 F. Supp. 2d at 397.

In this case, Spence and Flynn knew that McNeal was observed alone with a second-grade student in a room, contrary to MMCC policy; had the child sitting on his lap; was moving his legs under her; and stopped once he realized he was being watched. *See* Pls. Response ¶¶ 78-82. DOE and MMCC personnel have acknowledged that an incident of this nature is inappropriate and would warrant investigation and reporting. *Id.* ¶ 152. Based on those facts, viewed in the light most favorable to Plaintiffs, a reasonable jury could conclude that the March 20, 2023 incident put Principal Spence and Assistant Principal Flynn on sufficient notice of the substantial risk of abuse like that underlying the present suit, even if it did not give them actual knowledge of all of McNeal's conduct.

2. DYCD

A reasonable jury could also find that DYCD's program manager Nicole Manning obtained sufficient actual knowledge of the harassment. Manning reviewed McNeal's personnel file on two site visits—first on April 17, 2023 and then on October 27, 2023. *See id.* ¶¶ 175-78, 215-17. That file contained an email memorializing McNeal's suspension for the March 20, 2023 incident. *Id.* ¶ 176. Moreover, in between those two visits, Manning received an email from McNeill with that suspension email attached, as well as a director's report mentioning the suspension. *See id.* ¶¶ 182-84. A jury could conclude, based on those facts, that Manning knew of the March 20, 2023 incident as early as her April 17, 2023 site visit. Accordingly, City Defendants have failed to show the lack of a genuine factual dispute as to actual knowledge.

**B. Deliberate Indifference**

A response to harassment is deliberately indifferent "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. As a general matter, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* But at the same time, a response "must be more than minimalist," and a "fail[ure] to act, or act[ing] in a way which could not have reasonably been expected to remedy the violation" are inadequate. *Tesoriero*, 382 F. Supp. at 399; *see also Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012) (explaining, in applying equivalent deliberate indifference standard, that "[r]esponses that are not reasonably calculated to end harassment are inadequate"). In evaluating a defendant's response, the "procedural regularity of the . . . response—such as whether it addressed the discrimination by following established procedures—is probative of deliberate indifference." *Schiebel*, 120 F.4th at 1095 n.6.

1. DOE

City Defendants argue that DOE's response could not be deliberately indifferent, because Assistant Principal Flynn immediately notified MMCC leadership of the March 20, 2023 incident and filed an OORS report. However, there are significant disputed facts here. Plaintiffs point to evidence that the OORS report was faulty, as it omitted significant information that should have been in a proper report and falsely designated the incident as occurring off school grounds. *See* Pls. Response ¶ 87. Plaintiffs also rely on evidence that Spence and Flynn did not follow proper DOE procedures by failing to make numerous reports about the incident. *See id.* ¶¶ 159-60, 304, 307. Nor, after this incident, did Spence or Flynn follow up with program director McNeill to ask about any other issues or concerns about McNeal. *Id.* ¶ 161.

While the Court is aware that it is not its role to second-guess school disciplinary decisions with the benefit of hindsight, on this record it concludes that "the issue seems best suited for a jury to consider the range of all known circumstances." *Zamora*, 414 F. Supp. 2d at 425. Especially given Plaintiffs' evidence that Principal Spence and Assistant Principal Flynn failed to properly follow their own established procedures in dealing with the March 20, 2023 incident, there is a genuine dispute over the "fact-laden question," *Tesoriero*, 382 F. Supp. 2d at 398, of whether their response amounts to deliberate indifference.

2. DYCD

When it comes to DYCD's response, City Defendants do not point to anything as a sufficient response to the March 20, 2023 incident, relying instead on their argument that DYCD lacked actual knowledge of the incident until December 2023. *See* Mem. in Supp. of Mot. at 7. But as noted above, the Court rejects that argument given DYCD's program manager Nicole Manning's review of McNeal's personnel file on site visits on April 17, 2023 on October 27, 2023. And despite that, the record does not suggest that DYCD did anything in response to the March

20, 2023 incident. *See* Pls. Response ¶ 185. Thus, as to DYCD, as well, Plaintiffs' claim survives summary judgment on the issue of deliberate indifference.[3]

### C. Substantial Control

Finally, City Defendants argue that DOE and DYCD lacked sufficient "control over both the harasser and the context in which the known harassment occurs," *Davis*, 526 U.S. at 645, to be held liable under Title IX. Whether an institution exercises the "substantial control" required is "a fact-specific inquiry." *Ware v. Univ. of Vt. & State Agric. Coll.*, 722 F. Supp. 3d 379, 420 (D. Vt. 2024). Courts evaluating the question can focus on factors including the institution's "disciplinary authority" over and "support for" off-campus programs, for example. *Id.* at 421.

As an initial matter, the Court notes that City Defendants do not mention Summer Rising at all in their arguments about their lack of substantial control. Even if the Court were to give them the benefit of the doubt, however, and construe their arguments about Beacon@185 as extending also to Summer Rising, the arguments fail. City Defendants essentially rely on MMCC's control over the Beacon program and over McNeal. But the mere fact that MMCC had such control does not necessarily mean that City Defendants did not *also* have substantial control over McNeal and the context of his abuse. Indeed, as the factual background set out above makes clear, there is abundant evidence that, viewed in the light most favorable to Plaintiffs, could demonstrate substantial control by both DOE and DYCD.

---

[3] For the first time in their reply brief, City Defendants argue that even if they responded with deliberate indifference, that response did not sufficiently cause DD to undergo further abuse or make her more vulnerable to it. *See* Reply in Supp. of Mot. at 11, ECF No. 164. This argument is waived because it was first raised on reply. *See, e.g.*, *Chevron Corp. v. Donziger*, 325 F. Supp. 3d 371, 379 n.21 (S.D.N.Y. 2018) ("It is well established, of course, that arguments first raised in reply briefs are forfeited or waived."). But even if it were properly before the Court, a reasonable jury could easily conclude that City Defendants' inadequate response enabled McNeal to continue his course of abuse, causing AA and DD to suffer more abuse than if McNeal had been (for example) more seriously disciplined, transferred away from AA and DD, or fired.

Without recounting all of the evidence, the Court emphasizes, for example, Plaintiffs' evidence that: DOE controlled what school spaces Beacon had access to, and Principal Spence enforced those limitations, *see* Pls. Response ¶¶ 50-53; Spence was the "principal in charge" required to be present during the CBO-led afternoon sessions of Summer Rising, *see id.* ¶ 329; Spence closely supervised Beacon@185 in practice, conducting walkthroughs and meeting regularly with McNeill to stay informed of any incidents and to inform McNeill of parent complaints about Beacon to be addressed, *see id.* ¶¶ 54, 350-54; Spence had at least some disciplinary power over MMCC staff in practice, and could request a new CBO provider, *see id.* ¶¶ 86, 163, 316; DYCD set numerous requirements for CBOs like MMCC including required staff trainings, incident reporting requirements, and mandatory student-to-staff ratios, *see id.* ¶¶ 57-58, 60, 63-73, 395-99, 404; DYCD supervised the Beacon program through a program manager who kept in regular contact with Beacon staff and conducted site visits in order to ensure compliance with DYCD's various requirements, *see id.* ¶¶ 22, 29, 63, 67, 74, 405-11, 420, 453-55; and DYCD wielded significant disciplinary authority over MMCC as the provider of Beacon@185 and Summer Rising, *see id.* ¶¶ 67, 375-76, 388, 402, 450-52, 460, 463-65.

In short, when viewed most favorably to Plaintiffs, there is enough evidence in the record to allow a reasonable factfinder to find that DOE and DYCD exercised substantial control over both McNeal and the context of his harassment. City Defendants could and did manage and oversee the Beacon and Summer Rising programs to a significant degree, including by monitoring for misconduct by MMCC staff members. They had the authority to direct MMCC to fix problems they identified (including with regard to incident reporting), and to discipline MMCC if it did not fix them. For all these reasons, genuine disputes of material fact preclude summary judgment on Plaintiffs' Title IX claim. City Defendant's motion is **DENIED**.

## II. Negligence Claims

City Defendants also seek summary judgment as to Plaintiffs' claims for negligent supervision, negligent hiring and retention, and respondeat superior. In addition to arguments regarding each specific claim, City Defendants argue that they all fail for lack of a special duty owed to Plaintiffs and because of governmental immunity. The Court thus begins by considering City Defendants' immunity and special duty arguments, before taking each individual claim in turn.

### A. Governmental Immunity and the Special Duty Rule

New York law limits negligence claims against municipal defendants in several ways. *See Ferreira v. City of Binghamton*, 38 N.Y.3d 298, 307-12 (2022). As an initial matter, there is a specific requirement for the element of duty. Where, as here, a municipality is "exercising a governmental function," a plaintiff must establish a "special duty . . . on the part of the municipal defendant running to the plaintiff"—one that goes beyond merely a duty "owed the public generally." *Id*. at 309-10.

If a plaintiff can establish such a duty, the question then becomes whether the defendant can avail itself of the "governmental function immunity defense." *Id.* at 311. This doctrine provides immunity when "the alleged negligent act or omission involved the exercise of discretionary authority." *Id.* at 311. By contrast, there is no immunity for actions that are ministerial. *Id.* at 312. Discretionary acts "involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result." *Devlin v. City of N.Y.*, 148 N.Y.S.3d 149, 151 (N.Y. App. Div. 2021). Importantly, for immunity to attach, it is required "that the discretion possessed by [municipal] employees was *in fact exercised* in relation to the conduct on which liability is predicated." *Ferreira*, 38 N.Y.3d at 311 (emphasis added). In short, City

Defendants can be liable only if they owed Plaintiffs a special duty and—even then—cannot be liable for discretionary actions where that discretion was in fact exercised.

City Defendants argue that, as a matter of law, they owed no special duty to Plaintiffs and immunity attaches because Plaintiffs' claims are premised on discretionary government actions. For the reasons below, the Court disagrees.

1. Special Duty

City Defendants and Plaintiffs dispute whether Plaintiffs can establish a special duty based on the so-called *Cuffy* factors. *See Cuffy v. City of N.Y.*, 69 N.Y.2d 255, 260 (1987). But that is not the only potential basis for a special duty. As MMCC Defendants point out, *see* MMCC Mem. in Opp'n to Mot. at 12-13, ECF No. 157, under New York law schools owe a special duty to students in their custody. *See Weisbrod-Moore v. Cayuga Cnty.*, 44 N.Y.3d 187, 193 (2025); *id.* at 196 (citing *Pratt v. Robinson*, 39 N.Y.2d 554, 560 (1976)); *Adams v. Suffolk Cnty.*, 222 N.Y.S.3d 501, 510 (N.Y. App. Div. 2024). In this situation, the *Cuffy* factors are "inapplicable," since a special duty "necessarily exists by virtue of the custodial relationship" between school and students. *Adams*, 222 N.Y.S.3d at 511; *see also Cianciotto v. N.Y.C. Dep't of Educ.*, 600 F. Supp. 3d 434, 461 n.14 (S.D.N.Y. 2022) ("That relationship in mind, courts have routinely recognized the viability of negligence claims against school districts."). The Court takes this approach.

The special duty owed by a school to a student "is coextensive with and concomitant to its physical custody of and control over the child," and ceases when "the child has passed out of the orbit of its authority in such a way that the parent is perfectly free to reassume control over the child's protection." *Pratt*, 39 N.Y.2d 554, 560 (1976); *see also Fotiadis v. City of N.Y.*, 853 N.Y.S.2d 591, 592 (N.Y. App. Div. 2008) (applying same test to determine scope of control by operator of after-school program). Here, as discussed above in the context of the Title IX claim, there is substantial evidence of DOE control over and involvement in the Beacon and Summer

Rising programs. While substantial control under Title IX is not precisely the question here, the same evidence also creates genuine factual disputes concerning whether AA and DD remained within the orbit of DOE authority when they transitioned from school to Beacon@185 and when they attended Summer Rising. In essence, sufficient DOE control over those programs could mean that children in the custody and control of the programs remained ultimately under the control of DOE. *Cf. Wilson v. Archdiocese of N.Y.*, 251 N.Y.S.3d 686, 687 (N.Y. App. Div. 2026) (denying summary judgment on duty owed by Archdiocese to student in high school where there was "an issue of fact as to whether the Archdiocese operated and controlled, at least in part, [the high school]"); *Pratt*, 39 N.Y.2d at 560 ("[W]hen the school district undertook to offer the busing it did, it extended its control over its pupils from the school door to the bus stop[.]"). And similar reasoning applies to DYCD. Given the evidence of DYCD involvement in and control over the programs, there are at least factual disputes bearing on whether the children were also within DYCD's orbit of authority when in the care of the Beacon and Summer Rising programs.

In the context of disputing Plaintiffs' negligent supervision claim, City Defendants point to several cases where students in after-school programs were deemed not to be in the custody or control of a school. But those decisions are distinguishable on this record. In each, the court emphasized that merely allowing an after-school program run by a separate entity to operate on school grounds did not extend the school's control or custody over children to those programs. *See R.K. by Fatmir K. v. City of N.Y.*, 161 N.Y.S.3d 16 (2021) ("That the DOE permitted MBS to run as an afterschool program on school grounds does not provide a basis for holding the DOE liable[.]"); *McCrae v. City of N.Y.*, 843 N.Y.S.2d 232, 232-33 (N.Y. App. Div. 2007) (concerning "after-school program run by defendant Kaplan, Inc."); *Jonathan A. v. Bd. of Educ. of City of N.Y.*, 779 N.Y.S.2d 3, 5 (N.Y. App. Div. 2004) (concerning after-school program that school "had neither supervised, monitored nor participated in running"). Here, however, it is not simply the

fact that City Defendants permitted the Beacon and Summer Rising programs to run on school grounds, but evidence that City Defendants themselves were significantly involved in operating these particular programs that sufficiently supports the existence of a special duty.

At this stage in the litigation, the Court cannot conclude that AA and DD were outside the custody and control of City Defendants while attending the Beacon and Summer Rising programs. Plaintiffs have therefore sufficiently established a special duty to withstand summary judgment.

2. Immunity

Turning to governmental function immunity, City Defendants fail to show that, as a matter of law, the actions underlying Plaintiffs' claims "involved the exercise of discretion or expert judgment in policy matters," such that they require immunity. *Ojeda v. Metro. Transp. Auth.*, 41 F.4th 56, 69 (2d Cir. 2022). First, Plaintiffs identify evidence that City Defendants violated their own policies in dealing with McNeal, by failing to follow established reporting procedures. *See* Pls. Response ¶¶ 101, 159-60, 185, 237-38, 247, 254, 263. Even "[o]therwise-discretionary actions of municipal employees do not result in discretionary immunity . . . unless the injury-producing act . . . complied with a municipality's own rules and policies." *Ferreira v. City of Binghamton*, 975 F.3d 255, 270 (2d Cir. 2020), *certified question answered*, 38 N.Y.3d 298 (2022). Such actions cannot support immunity since "the very basis for the value judgment supporting immunity and denying individual recovery becomes irrelevant where the municipality violates its own internal rules and policies." *Boyd v. Vill. of Mamaroneck*, 258 N.Y.S.3d 79, 91 (N.Y. App. Div. 2026).

Second, City Defendants' argument fails because they have not identified evidence that governmental discretion was "in fact exercised." *Ferreira*, 38 N.Y.3d 298 at 311. "Immunity is not available unless the municipality establishes that the action taken actually resulted from discretionary decision-making." *Devlin*, 193 A.D.3d at 821; *see also Valdez v. City of N.Y.*, 18

N.Y.3d 69, 79 (2011) ("In order to prevail on a governmental function immunity defense, a municipality must do much more than merely allege that its employee was engaged in activities involving the exercise of discretion."). Here, City Defendants have argued generally and in relatively conclusory fashion that decisions of the sort DOE, DYCD, and MMCC actors had to make are discretionary, but they fail to point to evidence that the actors in question actually exercised such discretion when committing the acts and omissions underlying Plaintiffs' claims. *See* Mem. in Supp. of Mot. at 10-12; Reply in Supp. of Mot. at 16. For that reason alone, City Defendants are not entitled to summary judgment on the basis of their immunity defense. *See, e.g.*, *A.S. v. Nassau Cnty.*, 238 N.Y.S.3d 579, 580-81 (N.Y. App. Div. 2025) (denying summary judgment on this basis); *Diamond Jewels v. Lewis*, No. 15-cv-5760, 2019 WL 5896224, at *26-27 (E.D.N.Y. Nov. 12, 2019) (denying summary judgment where it was "not clear from this record that the defendants actually exercised discretion"). Having disposed of City Defendants' special duty and governmental immunity arguments, the Court now proceeds to consider Plaintiffs' negligence claims one by one.

**B. Negligent Supervision**

Plaintiffs claim that City Defendants negligently supervised AA and DD. "Schools are under a duty to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision." *Mirand v. City of N.Y.*, 84 N.Y.2d 44, 49 (1994). Where, as here, the claim is predicated on "negligent supervision due to injuries related to an individual's intentional acts, the plaintiff generally must demonstrate that the school knew or should have known of the individual's propensity to engage in such conduct, such that the individual's acts could be anticipated or were foreseeable." *Nevaeh T. v. City of N.Y.*, 18 N.Y.S.3d 415, 418 (N.Y. App. Div. 2015).

City Defendants argue that they did not have custody or control of AA and DD during the Beacon program, and so no longer owed them a duty of adequate supervision. They also argue that they lacked sufficient notice of McNeal's dangerous propensity. The Court has already determined, in the context of the special duty analysis, that City Defendants have not established AA and DD were outside their custody and control. It therefore turns to the question of notice.

City Defendants make no argument for a lack of notice after the March 20, 2023 incident. So at minimum, Plaintiffs' claim can proceed for negligent supervision after that date. As for notice before that incident, Plaintiffs have adduced sufficient evidence to establish a genuine factual dispute over whether DOE knew or should have known of McNeal's propensities before March 20, 2023. McNeal was seen paying special attention to AA and having her sit on his lap, and was found alone with individual children in school spaces contrary to policy—and this inappropriate conduct generated staff complaints and led to reminders from MMCC program director and DOE substitute teacher McNeill. *See* Pls. Response ¶¶ 118, 134-48. Given that DOE personnel were in the school building at the same time as these events (including Principal Spence, who would regularly conduct walkthroughs of the Beacon program), there is at least a factual dispute as to whether DOE knew or should have known of McNeal's potential to harass or abuse students prior to March 20, 2023. *See id.* ¶¶ 34-35, 40-41, 350-54, 359, 361-63. Against this evidence, Assistant Principal Flynn's testimony that she did not know of any incidents involving McNeal before March 20, 2023, *see* Defs. Statement ¶ 88, is insufficient at the summary judgment stage. *Cf. S.A.W. v. Archdiocese of N.Y.*, 250 N.Y.S.3d 63, 65 (N.Y. App. Div. 2026) (concluding affidavit from principal "who attested in conclusory fashion that there was no record indicating" individual abused any child was "insufficient to eliminate triable issues of fact" on constructive notice of individual's propensities). The record instead "reflect[s] the existence of a triable issue

of fact as to whether the DOE had knowledge of [McNeal's] propensities." *Nevaeh*, 18 N.Y.S.3d at 418.

**C. Negligent Hiring and Retention**

To succeed on their claim of negligent hiring and retention, Plaintiffs must establish that McNeal and City Defendants "were in an employee-employer relationship," that City Defendants "knew or should have known of [McNeal's] propensity for the conduct which caused the injury," and that McNeal's "tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). City Defendants argue that there was no employment relationship between them and McNeal, and that in any case they lacked notice of McNeal's propensities.

City Defendants argue that McNeal was exclusively the employee of MMCC, highlighting that organization's role in interviewing him, issuing his paycheck, and maintaining his personnel records. Mem. in Supp. of Mot. at 8. But Plaintiffs point to evidence that City Defendants were involved in conducting background checks for Beacon and Summer Rising staff, as well as determining and overseeing staff members' day-to-day duties and performance, and also exercised significant disciplinary authority over staff members. *See* Pls. Response ¶¶ 10, 54, 57-58, 60-67, 74, 285-88, 316, 318-22, 329, 332, 342-43, 350-54, 375-76, 388, 402, 431, 442-55, 463-65. The Court concludes that there are triable issues of fact that preclude summary judgment on the basis that McNeal and City Defendants lacked an employment relationship.

Instructive here is *Northacker v. Cnty. of Ulster*, 181 N.Y.S.3d 709 (N.Y. App. Div. 2022). There, the court considered on summary judgment whether a driver with a senior citizen transportation service offered through a collaboration between a county and a private organization was the agent of both entities for purposes of respondeat superior liability. *See* 181 N.Y.S.3d at 712, 714. Having first established that the driver was an employee of the county, the court noted

that "a person may be deemed to have more than one employer or to have acted on behalf of multiple principles," and emphasized that drivers in the program were "subject to significant supervision and control by" the private organization. *Id.* at 714. Ultimately, the court concluded that the record was "simply unclear as to how much control" the private organization "had or exercised over volunteers" like the driver, and so "no party was entitled to summary judgment. *Id.* While the facts of *Northacker* are not identical to those here, it is helpful by analogy. As already discussed several times, the record is at least disputed as to the degree of control and supervision City Defendants exercised over the Beacon and Summer Rising programs. There are accordingly triable issues of fact concerning the existence of an employment relationship between McNeal and City Defendants, in addition to the undisputed one between McNeal and MMCC.

On reply, City Defendants point to language in the contract between MMCC and DYCD purporting to establish that MMCC employees were not City employees. But the Court looks to the actual relationship between the parties in practice, and the control exercised by DYCD over MMCC. *See PB-20 Doe v. St. Nicodemus Lutheran Church*, 212 N.Y.S.3d 781, 784 (N.Y. App. Div. 2024) ("In deciding whether an employment relationship exists, we consider, inter alia, who controls and directs the manner, details, and ultimate result of the employee's work."); *Royal Ins. Co. of Am. v. RU-VAL Elec. Corp.*, 918 F. Supp. 647, 653 (E.D.N.Y. 1996) ("Courts look for the exertion of actual control, not formal indicia of control."). It is the actual relationship between City Defendants and MMCC employees that is dispositive, and as noted, there is a genuine dispute of fact as to the precise nature of that relationship.

As for notice, Plaintiffs do not point to evidence that City Defendants knew or should have known of McNeal's propensities before hiring him. *See* Pls.' Mem. in Opp'n to Mot. at 28-31, ECF No. 158. There can therefore be no claim for negligent hiring of him. But as for negligent retention, for the same reasons discussed in the context of the negligent supervision claim, there is

sufficient evidence to support a finding that DOE had at least constructive notice of McNeal's propensities after he had been hired, even before the March 20, 2023 incident. And there is even more evidence for notice arising from and after that incident. *See* Pls. Response ¶¶ 79-81, 189-98, 202, 206-09, 212-14. With regard to DYCD, there is sufficient evidence to create a triable issue of fact on notice as of program manager Nicole Manning's site visit to Beacon and review of McNeal's employee file. *See id.* ¶¶ 175-76, 178, 182-84, 188, 215-17. Thus, Plaintiffs' claim can proceed past summary judgment as to City Defendants' negligent retention of McNeal.

**D. Respondeat Superior**

Plaintiffs seek to hold DOE liable through a theory of respondeat superior for the negligence of its employees Vargas and McNeill, each of whom also had separate jobs with MMCC.[4] For their claim to succeed, Plaintiffs must demonstrate that the employees' negligent acts or omissions were committed within the scope of their employment with DOE. *See, e.g.*, *Browne v. Lyft, Inc.*, 194 N.Y.S.3d 85, 87-88 (N.Y. App. Div. 2023). City Defendants argue that this is not the case because "[t]he relevant decisions those actors made . . . were taken within the MMCC/Beacon chain of command, not as City/DOE employment actions." Reply in Supp. of Mot. at 15; *see also* Mem. in Supp. of Mot. at 9-10.

While the issue in respondeat superior claims is often whether actions were taken in furtherance of one's employment or for "wholly personal reasons, which are not job related," *Pinto v. Tenenbaum*, 963 N.Y.S.2d 699, 701 (N.Y. App. Div. 2013), that is not the nature of the dispute here. City Defendants do not claim that McNeill's and Vargas's actions were taken for personal

[4] City Defendants argue in passing that Plaintiffs fail to identify an underlying tort for respondeat superior liability, without contesting specific elements of any claim. *See* Mem. in Supp. of Mot. at 10. But Plaintiffs have clearly identified their claim of negligence by McNeill and Vargas within the scope of their DOE employment. *See* Compl. ¶¶ 489-502, ECF No.1; Pls.' Mem. in Opp'n to Mot. at 33.

reasons. Rather, the question is whether the actions were solely within the scope of their MMCC employment and not within the scope of their DOE employment. Ultimately, whether actions were undertaken in the scope of employment "requires a fact-intensive inquiry," and so the "ultimate determination of this issue is ordinarily for the jury." *Girden v. Sandals Int'l*, 262 F.3d 195, 205 (2d Cir. 2001). The Court concludes that is the case here. Especially given the overlap between the individuals' DOE and MMCC jobs in terms of where and when they occurred, as well as what duties they entailed, there are sufficient factual disputes to preclude summary judgment on this issue.

First, it is not clear that Plaintiffs' negligence claim is entirely cabined to specific actions that McNeill and Vargas undertook during the hours of the Beacon and Summer Rising programs. Even if McNeill and Vargas learned of McNeal's troubling behavior during those programs, Plaintiffs' claims that they negligently ignored the behavior and failed to act appropriately in response, *see* Pls. Response ¶¶ 101, 221-22, 237-38, 247, 269, can arise from the failure to act during their DOE jobs, as well.

Second, in any case, it is not clear on this record that the DOE and MMCC roles can be so easily separated into their respective hours of the day for both McNeill and Vargas. It is undisputed that Vargas worked in her DOE role until at least 4:00 p.m., and that Beacon@185 began at 2:40 p.m. *See id.* ¶¶ 18, 34. Moreover, evidence suggests Vargas herself may have blurred the lines between her two jobs, sending emails from her DOE account during Beacon hours and using her DOE office for her work with Beacon students—even though her room was not one of the school spaces Beacon had a permit to use. *See id.* ¶¶ 18, 335-40; *see also id.* ¶ 242 (describing meeting with DD's parents in Vargas's DOE office). As for McNeill, Plaintiffs point to evidence that she was fired by DOE precisely for claiming to work the same hours of the day simultaneously for DOE and MMCC. *See id.* ¶ 274.

For these reasons, City Defendants have not established the absence of any genuine factual dispute concerning whether McNeill's and Vargas's negligence occurred solely within the scope of their MMCC employment and not within the scope of their DOE employment. City Defendants are therefore not entitled to summary judgment on Plaintiffs' respondeat superior claim.

## III. Punitive Damages

Defendants argue they are entitled to summary judgment dismissing Plaintiffs' request for punitive damages under the NYCHRL and GMVPA, because such damages are not available under either law. The Court agrees.

Plaintiffs concede that binding Second Circuit precedent establishes that punitive damages are not available against municipalities under the NYCHRL, and seek simply to preserve this issue for appeal. *See* Pls.' Mem. in Opp'n to Mot. at 39. Indeed, in *Krohn v. N.Y.C. Police Dep't*, 372 F.3d 83 (2d Cir. 2004), the Second Circuit squarely held—after the New York Court of Appeals answered the question on certification, *see Krohn v. N.Y.C. Police Dep't*, 2 N.Y.3d 329 (2004)—that the NYCHRL does not permit punitive damages against municipalities.

As for the GMVPA, the parties point to no caselaw, and the Court has found none, addressing whether plaintiffs can recover punitive damages against municipalities under it. It appears to be an open question of New York law. Accordingly, the Court will "predict how [New York's] highest court would resolve" the issue, "constru[ing] and appl[ying] state law as it believes the state's highest court would." *Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 236 (S.D.N.Y. 2011). Here, *Krohn* and the material similarities of the NYCHRL and GMVPA guide the Court in doing so.

In *Krohn*, the New York Court of Appeals considered whether the NYCHRL permits punitive damages against municipalities, in light of precedent that municipal entities could be sued under the law. *See* 2 N.Y.3d at 333-34. As relevant to the analysis, the NYCHRL provides:

"Except as otherwise provided by law, any person claiming to be aggrieved by an unlawful discriminatory practice . . . shall have a cause of action . . . for damages, including punitive damages." N.Y.C. Admin. Code § 8-502; *see Krohn*, 2 N.Y.3d at 334. The Court of Appeals held, however, that this general authorization of punitive damages, in a law that could also generally be applied to municipal defendants, was not sufficient to abrogate the common-law rule prohibiting punitive damages against municipalities. It began by emphasizing that "a statute in derogation of the sovereignty of a State must be strictly construed, waiver of immunity by inference being disfavored." *Krohn*, 2 N.Y.3d at 335. It then reasoned that "[t]he absence of any specific reference to the municipality in the provision" meant the statutory language was "insufficient to waive the City's immunity to punitive damages liability." *Id.* Moreover, the Court of Appeals found its conclusion reinforced by the statutory language, "[e]xcept as otherwise provided by law," which it interpreted as (in part) a reference to common-law rules restricting municipal liability. *See id.* at 336. At most, the Court stated, the provision could be deemed ambiguous on the matter, but such ambiguity could not satisfy the requirement for "express legislative authorization or abrogation" of the "well-settled" rule against recovering punitive damages from municipalities. *Id.* at 336. The Court added that nothing in the law's legislative history indicated a clear intent to alter the common-law rule, and that there were practical reasons to doubt that the City Council would have "allow[ed] for open-ended punitive damages liability" from the City. *Id.* at 336-37. Ultimately, though, the Court of Appeals summarized its reasoning as relying on the fact that the law's text itself did not "clearly, expressly and specifically waive New York City's sovereign immunity." *Id.* at 338.

The GMVPA is materially similar to the NYCHRL in ways that track the court's reasoning in *Krohn*. Like the NYCHRL, it authorizes punitive damages generally, but does not specifically address the availability of punitive damages against municipal defendants. *See* N.Y.C. Admin.

Code § 10-1104. As the Court of Appeals observed with respect to the NYCHRL in *Krohn*, then, nothing in the text "clearly, expressly and specifically waive[s]" municipal immunity from punitive damages. *Krohn*, 2 N.Y.3d at 338. Moreover, also like the NYCHRL, the GMVPA limits its cause of action and authorization of damages with the opening caveat, "[e]xcept as otherwise provided by law." N.Y.C. Admin. Code § 10-1104. It is likely that the New York Court of Appeals would construe this phrase as it did in *Krohn*, as an additional textual clue that the City Council did not mean to alter a well-established common-law rule by implication.

Notably, Plaintiffs do not advance any real argument as to why the GMVPA should be construed differently from the NYCHRL, relying simply on the fact that it broadly authorizes punitive damages. But *Krohn* strongly suggests that the New York Court of Appeals would *not* understand such general language to waive municipal immunity from punitive damages, without specifically addressing the issue. Moreover, in recent decisions beyond *Krohn*, New York courts including the Court of Appeals have taken similarly stringent approaches to determining whether other statutes that generally authorize punitive damages abrogate municipal immunity from them. *See Matter of Arb. Between Rosbaugh & Town of Lodi*, 43 N.Y.3d 567, 573 (2025) (holding that treble damages under N.Y. Real Property Actions and Proceedings Law § 861 are "punitive in nature" and so "unavailable in a suit against a municipality"); *Cornell v. Cnty. of Monroe*, 132 N.Y.S.3d 213, 214 (N.Y. App. Div. 2020) (holding that N.Y. Public Health Law § 2801-d, which generally authorizes punitive damages, does not do so against municipalities); *see also Krohn v. N.Y.C. Police Dep't*, 341 F.3d 177, 181 (2d Cir. 2003) (observing, in certifying question to New York Court of Appeals, that the Court of Appeals "has not yet found sufficient legislative intent *in any law* to override the presumption against a waiver of municipal immunity" (emphasis added)).

Based on *Krohn*, the relevant similarities between the text of the NYCHRL and that of GMVPA, and New York courts' approach to the issue of municipal liability for punitive damages

under other statutes, the Court concludes that the New York Court of Appeals would most likely hold that the GMVPA does not authorize punitive damages against municipalities. City Defendants' motion for summary judgment on the availability of punitive damages is accordingly **GRANTED**.

## CONCLUSION

For the reasons discussed herein, City Defendants' motion for summary judgment on Plaintiffs' Title IX and negligence claims, ECF Nos. 128, 135, is **DENIED**, except as to any claim for negligent hiring (as opposed to negligent retention) of McNeal. City Defendants' motion for summary judgment on punitive damages, ECF No. 153, is **GRANTED**.

By October 14, 2026 the parties are **DIRECTED** to submit a joint letter stating the estimated length of trial and the parties' availability for a trial during the months of April, May, and June 2027. The parties shall further indicate whether they request a referral to the District's mediation program or to the assigned Magistrate Judge for a settlement conference.

The Clerk of Court is respectfully requested to terminate ECF Nos. 128, 135, and 153.

SO ORDERED.

Dated: September 30, 2026

New York, New York

DALE E. HO
United States District Judge